**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Guillermo Rocha , individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>        - against -<br><br>Perry Ellis International, Inc.,<br><br>                Defendant | 3:21-cv-50278<br><br><br>First Amended<br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Perry Ellis International, Inc. ("defendant") manufactures, labels, markets, and sells men's shirts purporting to be made only from Pima cotton on the neck tags, and then, in other locations, such as the Care label, disclaims this representation by identifying the men's shirts as only containing 65% Pima cotton, under its Perry Ellis brand ("Product").

2.      Both representations – that the items are only made with Pima cotton, and 65% Pima cotton – are false and misleading.

3.      Clothing is required to accurately disclose fiber composition under the Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. §§ 70, *et seq*. *See also* 16 C.F.R. Part 303.

4.      The main criteria to identify the type of cotton or other fiber is the fiber length.

5.      The length of cotton fibers affects its qualities and price – the longer the fiber, the stronger, softer, and more durable the resulting fabric, and it costs more.

6.      Pima cotton (*Gossypium barbadense L*) refers to extra-long staple ("ELS") cotton.

7.      The USDA defines Pima cotton as 1 5/16 (1.3125) inches. 7 C.F.R. § 28.304

("Original representation of American Pima cotton staple lengths.").

8.      Other established third-parties, such as TexTest laboratory, consider Pima cotton to fall within the range of 1.2 and 1.44 inches.

9.      Products made from Pima cotton are costlier than those from shorter types of cotton.

10.     This creates incentives for manufacturers and suppliers to mix cotton byproducts and shorter fibers with higher value longer fibers, to gain additional profits at the expense of consumers.

11.     16 CFR 303.15(b) allows for the fiber content to be disclosed on the neck of a garment in a conspicuous and readily accessible label or labels on the inside or outside of the product.

12.     16 CFR 423.1(a) defines a "Care label" as "a permanent label or tag, containing regular care information and instructions, that is attached or affixed in such a manner that it will not become separated from the product and will remain legible during the useful life of the product."

13.     16 CFR 303.16(a) allows for information required by the Act, such as fiber type and relative amounts, to appear on "any label or labels attached to the textile fiber product, including the care label… so long as the combination of required information and non-required information is not misleading."

14.     When consumers purchase clothes, this information is required to be presented to them in a way that is truthful and not misleading.

15.     Plaintiff purchased a Perry Ellis shirt substantially similar to the shirt pictured below, which contained statements identical to those contained on the item below, including, "Pima Cotton" on the neck tag, and "65% Pima Cotton" on the interior care label.



16.    The neck tag of the shirt states, "PIMA COTTON."



17.    By only identifying Pima cotton, consumers including Plaintiff were misled to

3

believe the Product was entirely or only Pima cotton and contained more Pima cotton than it did.

18.     However, the interior care label revealed the Product is only 65% Pima cotton and 35% "other cotton."



19.     However, even the representation that the Product is 65% Pima cotton overstates the percentage of Pima cotton used in the Product.

20.     Analysis by TexTest laboratory, performed according to the "Single-Fiber-Test" ASTM D5103 standard, determined the length and length distribution of fibers used in the Product. *See* Exhibit "A," annexed hereto.

21.     Of the 100 fibers sampled, all of them were below the minimum threshold for Pima cotton fiber length, whether using the USDA length or other range.

| Length Group Lower Limit (in.) | Number of Fibers | Percent of Total |
|---|---|---|
| 2.040 | 0 | 0 |
| 1.920 | 0 | 0 |
| 1.800 | 0 | 0 |
| 1.680 | 0 | 0 |
| 1.560 | 0 | 0 |
| 1.440 | 0 | 0 |
| 1.320 | 0 | 0 |
| 1.200 | 0 | 0 |
| 1.080 | 0 | 0 |
| 0.960 | 0 | 0 |
| 0.840 | 10 | 10 |
| 0.720 | 47 | 47 |
| 0.600 | 41 | 41 |
| 0.480 | 2 | 2 |
| 0.360 | 0 | 0 |
| 0.240 | 0 | 0 |
| 0.120 | 0 | 0 |
| 0.000 | 0 | 0 |
| | 100 | 100 |

22.     This means that neck tag, which only states, "Pima Cotton," giving the impression the Product is entirely Pima cotton, and the Care label, which states the Product is made with 65% Pima cotton, are both false.

23.     The average fiber length, according to TexTest, is 0.743 inches.

24.     Even if an adjustment was made to the fiber lengths by assuming a twenty-five (25) percent reduction during manufacturing, only ten of the fibers would be over one inch, and still not be long enough to be labeled as Pima cotton.

25.     These results support the strong inference that the percentage of Pima cotton used in the Product is significantly less than the amount indicated on the neck tag and Care label.

26.     The Product contains a significant amount of less expensive, shorter cotton fibers and/or cotton byproduct fibers.

27.     No reasonable consumer will expect that clothing advertised as containing a percent

or amount of Pima cotton would contain significantly less Pima cotton than promised.

28.     Whether a product contains the amount and/or percent of Pima cotton indicated is basic information consumers rely on when making decisions at the store.

29.     Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

30.     The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

31.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

32.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

33.     The Product is sold for a price premium compared to other similar products, no less than approximately $35.99, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

<div align="center">Jurisdiction and Venue</div>

34.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

35.     The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

36.     Plaintiff Guillermo Rocha is a citizen of Illinois.

37.     Defendant Perry Ellis International, Inc., is a Florida corporation with a principal place of business in Doral, Florida, Miami-Dade County.

38. Plaintiff and defendant are citizens of different states.

39. Venue is in this district because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

40. Venue is in the Western Division because plaintiff resides in Winnebago County, which is where the events giving rise to the present claims occurred.

## Parties

41. Plaintiff Guillermo Rocha is a citizen of Rockford, Winnebago County, Illinois.

42. Defendant Perry Ellis International, Inc., is a Florida corporation with a principal place of business in Doral, Florida, Miami-Dade County.

43. Defendant is one of the largest sellers of clothing in the world.

44. Perry Ellis was responsible for introducing new designs and methods into men's fashion, which included a focus on higher quality materials, for casual men's sportswear.

45. The success of the Perry Ellis brand was thus linked to its focus on premium materials, which it has not strayed from ever since its emergence in the mid-1980s.

46. Perry Ellis clothing is sold from its Perry Ellis-branded stores and outlets, third-parties such as Macy's and Nordstrom, and available online.

47. Manufacturers of textile products, like Defendant, must maintain records sufficient to substantiate the claims on its fiber content tags and labels. *See id.* at §70d.

48. Any guarantee of fiber content by a supplier is insufficient for Defendant to rely on when selling clothing to the public. *See* 16 C.F.R. § 303.39.

49. Plaintiff bought the Perry Ellis shirt within the statute of limitations, at stores including the Perry Ellis Outlet, 1650 Premium Outlets Blvd #1115, Aurora, IL 60504, between September and November 2020.

50.     Plaintiff bought the Perry Ellis shirt, relying on the neck tag description as "Pima Cotton," which he understood to mean it was entirely Pima cotton.

51.     After Plaintiff purchased the Product, he viewed the Care label which indicated it was 65% Pima cotton.

52.     Defendant's brand is synonymous with the highest quality, so that consumers trust the representations it makes.

53.     Plaintiff bought the Product because he expected it would contain the amount and/or percent of Pima cotton it indicated, and not a significant percentage less.

54.     Plaintiff knew Pima cotton was a higher quality fiber than regular cotton.

55.     Plaintiff did not expect the Product to contain a significant percent less of Pima cotton, certainly not no Pima cotton.

56.     Plaintiff knew that Defendant was a brand with an established reputation for quality and expected it would live up to its word on the Product's composition.

57.     Plaintiff bought the Product at or exceeding the above-referenced price.

58.     Plaintiff relied on the representations identified here.

59.     Plaintiff would not have purchased the Product if he knew the representations were false and misleading, or would have paid less for it.

60.     Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

61.     The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

62.     Plaintiff is reluctant to purchase any clothing with representations as to its Pima

cotton content because he believes that labeling will not be truthful.

63.     This causes him to avoid purchasing higher quality Pima cotton products, even though he values those products for reasons described above with respect to Pima cotton.

64.     Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's Pima cotton representations are consistent with its composition.

<div align="center">Class Allegations</div>

65.     Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged.

> **Consumer Fraud Multi-State Class:** All persons in the States of North Dakota, Kansas, West Virginia, Wyoming, and Delaware, who purchased the Product during the statutes of limitations for each cause of action alleged.

66.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

67.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

68.     Plaintiff is an adequate representative because his interests do not conflict with other members.

69.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

70.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

71.     Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to protect class members' interests adequately and fairly.

72.     Plaintiff seeks class-wide injunctive relief because the practices continue.

### Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq.

### (Consumer Protection Statute)

73.     Plaintiff incorporates by reference all preceding paragraphs.

74.     Plaintiff and class members desired to purchase a product that contained the amount

and/or percent of Pima cotton indicated and not a significant amount or percent less.

75.     The ICFA provides protection for consumers purchasing items like Perry Ellis' 65%

Pima cotton shirts, and states:

> Unfair methods of competition and unfair or deceptive acts or practices, including
> but not limited to the use or employment of any deception, fraud, false pretense,
> false promise, misrepresentation or the concealment, suppression, or omission of
> any material fact, with intent that others rely upon the concealment, suppression or
> omission of such material fact . . . are hereby declared unlawful

815 ILCS 505/2.

76.     Defendant's false and deceptive representations and omissions about the percentage

and/or amount of Pima cotton in its products are material in that they are likely to influence

consumer purchasing decisions.

77.     Defendant misrepresented the Product through statements, omissions, ambiguities,

half-truths and/or actions.

78.     Plaintiff relied on the representations that the Product was "Pima Cotton," as stated

in the neck tag, which he understood as meaning it was entirely Pima cotton.

79.     Plaintiff relied on the Care label representations that the Product was "65% Pima

Cotton."

80.     Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

81. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

82. The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case.

83. Defendant intended that plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

84. As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

85. In addition, defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<div align="center">
Breaches of Express Warranty,<br>
Implied Warranty of Merchantability and<br>
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq.</em>
</div>

86. The Product was manufactured, labeled, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it contained the amount and/or percent of Pima cotton indicated and not a significant amount or percent less.

87. Defendant had a duty to disclose and/or provide non-deceptive descriptions and identification of the Product.

88. This duty is based on Defendant's outsized role in the clothing business, a leading

men's clothing company and a pioneer in the area of men's sportswear and activewear.

89.     Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

90.     Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

91.     Defendant should have been aware of the inaccuracy of its fiber representations based on the information it is required to possess from its suppliers.

92.     The Product did not conform to its affirmations of fact and promises that it was entirely Pima cotton, and even that it was 65% Pima cotton, due to defendant's actions and was not merchantable because it was not fit to pass in the trade as advertised.

93.     Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

94.     Defendant had a duty to truthfully represent the Product, which it breached.

95.     This duty is based on defendant's position, holding itself out as having special knowledge and experience this area, as custodians and owners of the Perry Ellis brand, known for the highest quality clothing.

96.     The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a nationally recognized and trusted brand.

97.     Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

98.     Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

## Fraud

99.   Defendant misrepresented and/or omitted the attributes and qualities of the Product,

that it contained the amount and/or percent of Pima cotton indicated and not a significant amount

or percent less.

100.   Defendant possesses specialized knowledge regarding the fiber content of its

products and is in a superior position to learn about this.

101.   Moreover, the records Defendant is required to maintain provide it with actual and/or

constructive knowledge of the falsity of the representations.

102.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not

consistent with its representations.

## Unjust Enrichment

103.   Defendant obtained benefits and monies because the Product was not as represented

and expected, to the detriment and impoverishment of plaintiff and class members, who seek

restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.   Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the

13

applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:    November 5, 2021

<div style="margin-left: 50%;">

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
_____
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

</div>

14